JS 44   (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| VANESSA MCDONALD, Ind and as Adm of the ESTATE OF QUINSHA WHITE, Deceased, etal. | PHILADELPHIA HOUSING AUTHORITY, et al. |

**(b)** County of Residence of First Listed Plaintiff    Philadelphia County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Philadelphia County
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Thomas R. Kline, Esq. / Kline & Specter, PC,
1525 Locust Street, Phila. PA 19102   215-772-1000

Attorneys *(If Known)*

Unknown at this time

## II.  BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1   U.S. Government Plaintiff
- [x] 3   Federal Question  *(U.S. Government Not a Party)*
- [ ] 2   U.S. Government Defendant
- [ ] 4   Diversity  *(Indicate Citizenship of Parties in Item III)*

## III.  CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [x] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV.  NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance<br>[ ] 120 Marine<br>[ ] 130 Miller Act<br>[ ] 140 Negotiable Instrument<br>[ ] 150 Recovery of Overpayment & Enforcement of Judgment<br>[ ] 151 Medicare Act<br>[ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>[ ] 153 Recovery of Overpayment of Veteran's Benefits<br>[ ] 160 Stockholders' Suits<br>[ ] 190 Other Contract<br>[ ] 195 Contract Product Liability<br>[ ] 196 Franchise | **PERSONAL INJURY**<br>[ ] 310 Airplane<br>[ ] 315 Airplane Product Liability<br>[ ] 320 Assault, Libel & Slander<br>[ ] 330 Federal Employers' Liability<br>[ ] 340 Marine<br>[ ] 345 Marine Product Liability<br>[ ] 350 Motor Vehicle<br>[ ] 355 Motor Vehicle Product Liability<br>[ ] 360 Other Personal Injury<br>[ ] 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>[ ] 365 Personal Injury - Product Liability<br>[ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>[ ] 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>[ ] 370 Other Fraud<br>[ ] 371 Truth in Lending<br>[ ] 380 Other Personal Property Damage<br>[ ] 385 Property Damage Product Liability | [ ] 625 Drug Related Seizure of Property 21 USC 881<br>[ ] 690 Other | [ ] 422 Appeal 28 USC 158<br>[ ] 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>[ ] 820 Copyrights<br>[ ] 830 Patent<br>[ ] 835 Patent - Abbreviated New Drug Application<br>[ ] 840 Trademark<br>[ ] 880 Defend Trade Secrets Act of 2016 | [ ] 375 False Claims Act<br>[ ] 376 Qui Tam (31 USC 3729(a))<br>[ ] 400 State Reapportionment<br>[ ] 410 Antitrust<br>[ ] 430 Banks and Banking<br>[ ] 450 Commerce<br>[ ] 460 Deportation<br>[ ] 470 Racketeer Influenced and Corrupt Organizations<br>[ ] 480 Consumer Credit (15 USC 1681 or 1692)<br>[ ] 485 Telephone Consumer Protection Act<br>[ ] 490 Cable/Sat TV<br>[ ] 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **SOCIAL SECURITY** | [ ] 890 Other Statutory Actions |
| [ ] 210 Land Condemnation<br>[ ] 220 Foreclosure<br>[ ] 230 Rent Lease & Ejectment<br>[ ] 240 Torts to Land<br>[ ] 245 Tort Product Liability<br>[ ] 290 All Other Real Property | [x] 440 Other Civil Rights<br>[ ] 441 Voting<br>[ ] 442 Employment<br>[ ] 443 Housing/ Accommodations<br>[ ] 445 Amer. w/Disabilities - Employment<br>[ ] 446 Amer. w/Disabilities - Other<br>[ ] 448 Education | **Habeas Corpus:**<br>[ ] 463 Alien Detainee<br>[ ] 510 Motions to Vacate Sentence<br>[ ] 530 General<br>[ ] 535 Death Penalty<br>**Other:**<br>[ ] 540 Mandamus & Other<br>[ ] 550 Civil Rights<br>[ ] 555 Prison Condition<br>[ ] 560 Civil Detainee - Conditions of Confinement | [ ] 710 Fair Labor Standards Act<br>[ ] 720 Labor/Management Relations<br>[ ] 740 Railway Labor Act<br>[ ] 751 Family and Medical Leave Act<br>[ ] 790 Other Labor Litigation<br>[ ] 791 Employee Retirement Income Security Act | [ ] 861 HIA (1395ff)<br>[ ] 862 Black Lung (923)<br>[ ] 863 DIWC/DIWW (405(g))<br>[ ] 864 SSID Title XVI<br>[ ] 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>[ ] 870 Taxes (U.S. Plaintiff or Defendant)<br>[ ] 871 IRS—Third Party 26 USC 7609 | [ ] 891 Agricultural Acts<br>[ ] 893 Environmental Matters<br>[ ] 895 Freedom of Information Act<br>[ ] 896 Arbitration<br>[ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>[ ] 950 Constitutionality of State Statutes |
| | | | **IMMIGRATION**<br>[ ] 462 Naturalization Application<br>[ ] 465 Other Immigration Actions | | |

## V.  ORIGIN *(Place an "X" in One Box Only)*

- [x] 1  Original Proceeding
- [ ] 2  Removed from State Court
- [ ] 3  Remanded from Appellate Court
- [ ] 4  Reinstated or Reopened
- [ ] 5  Transferred from Another District *(specify)*
- [ ] 6  Multidistrict Litigation - Transfer
- [ ] 8  Multidistrict Litigation - Direct File

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. § 1983
Brief description of cause:
Violation of Plaintiffs constitutional rights resulting in fatal fire.

## VII.  REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ Excess of $75,000

CHECK YES only if demanded in complaint:
JURY DEMAND:   [x] Yes   [ ] No

## VIII.  RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____   DOCKET NUMBER _____

DATE
January 4, 2024

SIGNATURE OF ATTORNEY OF RECORD
/s/ Thomas  R. Kline

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **VANESSA MCDONALD**, Individually and as Co-Administratrix of the **ESTATE of QUINSHA WHITE**, Deceased, and **JEFFREY WHITE**, Individually and as Co-Administrators of the **ESTATE of QUINSHA WHITE**, Deceased<br>5594 South Hill Creek Drive<br>Philadelphia, PA 19120;<br><br>and<br><br>**VANESSA MCDONALD**, Individually and as Administratrix of the **ESTATE of ROSALEE MCDONALD**, Deceased<br>5594 South Hill Creek Drive<br>Philadelphia, PA 19120;<br><br>and<br><br>**VANESSA MCDONALD**, Individually and as Administratrix of the **ESTATE of NATASHA WAYNE**, Deceased<br>5594 South Hill Creek Drive<br>Philadelphia, PA 19120;<br><br>and<br><br>**VANESSA MCDONALD**, Individually and as Administratrix of the **ESTATE of SHANIECE WAYNE**, Deceased<br>5594 South Hill Creek Drive<br>Philadelphia, PA 19120;<br><br>and<br><br>**VANESSA MCDONALD**, Individually and as Administratrix of the **ESTATE of JANIYAH ROBERTS**, Deceased<br>5594 South Hill Creek Drive<br>Philadelphia, PA 19120; | **CIVIL ACTION NO:**<br><br>**JURY TRIAL DEMANDED** |

and

**ESTELLE MCDONALD**, Individually and as
Administratrix of the **ESTATE of VIRGINIA
THOMAS**, Deceased
5944 Tabor Avenue
Philadelphia, PA 19120;

and

**BEVERLY GRAHAM**, Administratrix of the
**Estate of QUINTIEN TATE-MCDONALD**,
Deceased
8566 Temple Road
Philadelphia, PA 19150;

and

**JAMES WILLIAMS, JR.**, Individually and as
Administrator of the **ESTATE of DESTINY
MCDONALD**, Deceased
640 Perth Place
Philadelphia, PA 19123;

and

**HOWARD ROBINSON**, Individually and as
Administrator of the **ESTATE of TIFFANY
ROBINSON**, Deceased
c/o STROKOVSKY LLC
1650 Market Street
Suite 3600
Philadelphia, PA 19103;

and

**HOWARD ROBINSON**, Individually and as
Administrator of the **ESTATE of TANIESHA
ROBINSON**, Deceased
c/o STROKOVSKY LLC
1650 Market Street
Suite 3600
Philadelphia, PA 19103;

and

**HOWARD ROBINSON**, Individually and as
Administrator of the **ESTATE of DEKWAN
ROBINSON**, Deceased
c/o STROKOVSKY LLC
1650 Market Street
Suite 3600
Philadelphia, PA 19103;

and

**HOWARD ROBINSON**, Individually and as
Administrator of the **ESTATE of J'KWAN
ROBINSON**, Deceased
c/o STROKOVSKY LLC
1650 Market Street
Suite 3600
Philadelphia, PA 19103;

*Plaintiffs,*

v.

**PHILADELPHIA HOUSING AUTHORITY**
2013 Ridge Avenue
Philadelphia, PA 19121;

and

**KELVIN A. JEREMIAH**, individually and in
his official capacity
*c/o PHILADELPHIA HOUSING AUTHORITY*
2013 Ridge Avenue
Philadelphia, PA 19121;

and

**JANEA JORDON**, individually and in her
official capacity
*c/o PHILADELPHIA HOUSING AUTHORITY*
2013 Ridge Avenue
Philadelphia, PA 19121;

and

**DINESH INDALA**, individually and in her official capacity
*c/o PHILADELPHIA HOUSING AUTHORITY*
2013 Ridge Avenue
Philadelphia, PA 19121;
                        and

**GREGORY HAMPSON**, individually and in his official capacity
*c/o PHILADELPHIA HOUSING AUTHORITY*
2013 Ridge Avenue
Philadelphia, PA 19121;

                        and

**EARL SAMUEL**, individually and in his official capacity
*c/o PHILADELPHIA HOUSING AUTHORITY*
2013 Ridge Avenue
Philadelphia, PA 19121;

                        and

**RONALD HENRY**, individually and in his official capacity
*c/o PHILADELPHIA HOUSING AUTHORITY*
2013 Ridge Avenue
Philadelphia, PA 19121;

                        and

**MARY MOC**, individually and in her official capacity
*c/o PHILADELPHIA HOUSING AUTHORITY*
2013 Ridge Avenue
Philadelphia, PA 19121;

                        and

**ERICKA CORLEY**, individually and in her official capacity
*c/o PHILADELPHIA HOUSING AUTHORITY*
2013 Ridge Avenue
Philadelphia, PA 19121;

and

**TABATHA REVELL**, individually and in her
official capacity
*c/o PHILADELPHIA HOUSING AUTHORITY*
2013 Ridge Avenue
Philadelphia, PA 19121;
and

**TRUC NGUYEN**, individually and in her
official capacity
*c/o PHILADELPHIA HOUSING AUTHORITY*
2013 Ridge Avenue
Philadelphia, PA 19121;

and

**BRAHIN BILAL**, individually and in his
official capacity
*c/o PHILADELPHIA HOUSING AUTHORITY*
2013 Ridge Avenue
Philadelphia, PA 19121;

and

**PHILADELPHIA DEPARTMENT OF
HUMAN SERVICES**
1515 Arch Street
Philadelphia, PA 19102;

and

**NADINE FULTON**, individually and in her
official capacity
*c/o PHILADELPHIA DEPARTMENT OF
HUMAN SERVICES*
1515 Arch Street
Philadelphia, PA 19102

*Defendants.*

## COMPLAINT

1.      Plaintiffs instituted this action pursuant to the Fifth and Fourteenth Amendments of the United States Constitution, 42 U.S.C. § 1983, the U.S. Housing Act, 42 U.S.C. § 1437 and its subparts, and the implementing regulations thereto, found principally at 24 C.F.R. § 982, against Defendants for the relief requested below.

## PARTIES

2.      Plaintiffs, Vanessa McDonald and Jeffrey White, Individually and as Co-Administrators of the Estate of Quinsha White, Deceased, by and through their attorneys Kline & Specter, P.C., file this Complaint against Defendants Philadelphia Housing Authority (hereinafter "PHA) and Department of Human Services (hereinafter "DHS") and the individual and/or supervisory Defendants of PHA and DHS as detailed below.

3.      Plaintiff, Vanessa McDonald, Individually and as Administratrix of the Estate of Rosalee McDonald, Deceased, by and through her attorneys Kline & Specter, P.C., files this Complaint against Defendants PHA and DHS and the individual and/or supervisory Defendants of PHA and DHS as detailed below.

4.      Plaintiff, Vanessa McDonald, Individually and as Administratrix of the Estate of Natasha Wayne, Deceased, by and through her attorneys Kline & Specter, P.C., files this Complaint against Defendants PHA and DHS and the individual and/or supervisory Defendants of PHA and DHS as detailed below.

5.      Plaintiff, Vanessa McDonald, Individually and as Administratrix of the Estate of Shaniece Wayne, Deceased, by and through her attorneys Kline & Specter, P.C., files this Complaint against Defendants PHA and DHS and the individual and/or supervisory Defendants of PHA and DHS as detailed below.

6.      Plaintiff, Vanessa McDonald, Individually and as Administratrix of the Estate of Janiyah Roberts, Deceased, by and through her attorneys Kline & Specter, P.C., files this Complaint against Defendants PHA and DHS and the individual and/or supervisory Defendants of PHA and DHS as detailed below.

7.      Plaintiff, Estelle McDonald, Individually and as Administratrix of the Estate of Virginia Thomas, Deceased, by and through her attorneys Kline & Specter, P.C., files this Complaint against Defendants PHA and DHS and the individual and/or supervisory Defendants of PHA and DHS as detailed below.

8.      Plaintiff, Beverly Graham, Administratrix of the Estate of Quintien Tate-McDonald, Deceased, by and through her attorneys Kline & Specter, P.C., files this Complaint against Defendants PHA and DHS and the individual and/or supervisory Defendants of PHA and DHS as detailed below.

9.      Plaintiff, James Williams, Jr., Individually and as Administrator of the Estate of Destiny McDonald, Deceased, by and through his attorneys Kline & Specter, P.C., files this Complaint against Defendants PHA and DHS and the individual and/or supervisory Defendants of PHA and DHS as detailed below.

10.      Plaintiff, Howard Robinson, Individually and as Administrator of the Estate of Tiffany Robinson, Deceased, by and through his attorneys Strokovsky LLC, files this Complaint against Defendants PHA and DHS and the individual and/or supervisory Defendants of PHA and DHS as detailed below.

11.      Plaintiff, Howard Robinson, Individually and as Administrator of the Estate of Taniesha Robinson, Deceased, by and through his attorneys Strokovsky LLC, files this Complaint against Defendants PHA and DHS and the individual and/or supervisory Defendants of PHA and

2

DHS as detailed below.

12.     Plaintiff, Howard Robinson, Individually and as Administrator of the Estate of DeKwan Robinson, Deceased, by and through his attorneys Strokovsky LLC, files this Complaint against Defendants PHA and DHS and the individual and/or supervisory Defendants of PHA and DHS as detailed below.

13.     Plaintiff, Howard Robinson, Individually and as Administrator of the Estate of J'Kwan Robinson, Deceased, by and through his attorneys Strokovsky LLC, files this Complaint against Defendants PHA and DHS and the individual and/or supervisory Defendants of PHA and DHS as detailed below.

14.     Plaintiff as set forth above shall – hereinafter – be referred to, collectively, as the "Plaintiffs."

15.     Defendant PHA is a housing authority created as an agency and instrumentality of the Commonwealth of Pennsylvania with a principal place of business located 2013 Ridge Avenue, Philadelphia, Pennsylvania 19121.

16.     At all material times relevant hereto, Defendant PHA acted by and through its duly authorized employees, agents, workers, and/or representatives, who were all acting within the scope of their agency.

17.     At all material times relevant hereto, Defendant PHA directly and through its duly authorized employees, agents, workers, and/or representatives, owned, operated, managed, inspected, maintained and/or actively controlled the premises located at 869 North 23rd Street, Unit B, Philadelphia, Pennsylvania 19130 (hereinafter "Unit B").

18.     Defendant Kelvin Jeremiah (hereinafter "Defendant Jeremiah") is an adult individual

3

and citizen of the Commonwealth of Pennsylvania with a place of business at the above-captioned address.

19.     Defendant Jeremiah was, at times material hereto, the President and Chief Executive Officer (hereinafter "CEO") of Defendant PHA. He was responsible for management of the PHA organization. Additionally, Defendant Jeremiah was the final policymaker for PHA and all aspects of PHA operations, including inspections, safety, maintenance, standards, procedures, protocols, and oversight. Defendant Jeremiah is being sued in both his individual and official capacities.

20.     Defendant Janae Jordon (hereinafter "Defendant Jordon") is an adult individual and citizen of the Commonwealth of Pennsylvania with a place of business at the above-captioned address.

21.     Defendant Jordon was, at times material hereto, the Senior Executive Vice President, Public Safety, Audit and Compliance of Defendant PHA. Defendant Jordon is a policymaker for PHA and was instructed with the task of identifying and reducing risks and ensuring that policies, procedures, laws, and regulations are followed throughout PHA. She was responsible for directing and overseeing PHA's internal audits, investigations, and compliance-related activities.  Defendant Jordon is being sued in both her individual and official capacities.

22.     Defendant Dinesh Indala (hereinafter "Defendant Indala") is an adult individual and citizen of the Commonwealth of Pennsylvania with a place of business at the above-captioned address.

23.     Defendant Indala was at times material hereto, the Senior Executive Vice President of Housing Operations of Defendant PHA. He was responsible for overseeing all property management and maintenance activities for PHA's public housing portfolio. He also oversees and supervises

4

employees having responsibility for emergency and routine service orders, admissions and leasing, rent collections, recertifications, resident supportive services, and other functions. Defendant Indala is being sued in both his individual and official capacities.

24.    Defendant Gregory Hampson (hereinafter "Defendant Hampson") is an adult individual and citizen of the Commonwealth of Pennsylvania with a place of business at the above-captioned address.

25.    Defendant Hampson, or person to be identified through discovery, upon information and belief, was at times material hereto, the Executive Vice President, Construction and Capitol Projects, of Defendant PHA. He was responsible for overseeing Defendant PHA's major housing construction and capital projects, including overseeing third party contractors, including approving, and overseeing the renovations at Unit B.  Defendant Hampson is being sued in both his individual and official capacities.

26.    Defendant Earl Samuel (hereinafter "Defendant Samuel") was, at times material hereto, a maintenance aid of Defendant PHA and Defendant PHA's scattered site program. He was responsible for ensuring that Plaintiffs' Decedents' Unit B was safe, decent, and in a sanitary condition. In this function, Defendant Samuel was tasked with performing quality checks of PHA properties, including Plaintiffs' Decedents' Unit B. Defendant Samuel is being sued in both his individual and official capacities.

27.    Defendant Ronald Henry (hereinafter "Defendant Henry") is an adult individual and citizen of the Commonwealth of Pennsylvania with a place of business at the above-captioned address.

28.    Defendant Henry was, at times material hereto, a maintenance mechanic of Defendant

PHA and Defendant PHA's scattered site program. He was responsible for ensuring that Plaintiffs' Decedents' Unit B was safe, decent, and in a sanitary condition. In this function, Defendant Henry was tasked with performing quality checks of PHA properties, including Plaintiffs' Decedents' Unit B. Defendant Henry is being sued in both his individual and official capacities.

29.     Defendant Mary Moc (hereinafter "Defendant Moc") is an adult individual and citizen of the Commonwealth of Pennsylvania with a place of business at the above-captioned address.

30.     Defendant Moc was, at times material hereto, a property manager of Defendant PHA and Defendant PHA's scattered site program. She was responsible for ensuring that Plaintiffs' Decedents' Unit B was safe, decent, and in a sanitary condition. Defendant Moc was tasked with managing all aspects of Unit B, including approving additional tenants and household members to be added to the lease of the property.  Defendant Moc is being sued in both her individual and official capacities.

31.     Defendant Ericka Corley (hereinafter "Defendant Corley") is an adult individual and citizen of the Commonwealth of Pennsylvania with a place of business at the above-captioned address.

32.     Defendant Ericka Corley was, at times material hereto, a property manager of Defendant PHA and Defendant PHA's scattered site program. She was responsible for ensuring that Plaintiffs' Decedents' Unit B was safe, decent, and in a sanitary condition. Defendant Corley was tasked with managing all aspects of Unit B, including approving additional tenants and household members to be added to the lease of the property. Defendant Corley is being sued in both her individual and official capacities.

33.     Defendant Tabitha Revell (hereinafter "Defendant Revell") is an adult individual and

citizen of the Commonwealth of Pennsylvania with a place of business at the above-captioned address.

34.     Defendant Revell was, at times material hereto, a property manager of Defendant PHA and Defendant PHA's scattered site program. She was responsible for ensuring that Plaintiffs' Decedents' Unit B was safe, decent, and in a sanitary condition. Defendant Revell was tasked with managing all aspects of Unit B, including approving additional tenants and household members to be added to the lease to the property.  Defendant Revell is being sued in both her individual and official capacities.

35.     Defendant Truc Nguyen (hereinafter "Defendant Nguyen") is an adult individual and citizen of the Commonwealth of Pennsylvania with a place of business at the above-captioned address.

36.     Defendant Nguyen was, at times material hereto, a property manager of Defendant PHA and Defendant PHA's scattered site program. She was responsible for ensuring that Plaintiffs' Decedents' Unit B was safe, decent, and in a sanitary condition. Defendant Nguyen was tasked with managing all aspects of Unit B, including approving additional tenants and household members to be added to the lease to the property.  Defendant Nguen is being sued in both her individual and official capacities.

37.     Defendant Brahin Bilal (hereinafter "Defendant Bilal") is an adult individual and citizen of the Commonwealth of Pennsylvania with a place of business at the above-captioned address.

38.     Defendant Bilal was, at times material hereto, a property manager of Defendant PHA and Defendant PHA's scattered site program. He was responsible for ensuring that Plaintiffs'

Decedents' Unit B was safe, decent, and in a sanitary condition. Defendant Bilal was tasked with managing all aspects of Unit B, including approving additional tenants and household members to be added to the lease to the property.  Defendant Bilal is being sued in both his individual and official capacities.

39.     Defendants PHA, Jeremiah, Jordon, Indala, Hampson, Samuel, Henry, Moc, Corley, Revell, Nguyen, and Bilal are hereinafter, collectively, referred to as the "PHA Defendants."

40.     Defendant DHS is a government agency that exists, in part, to provide child welfare and juvenile justice services with a goal to provide and promote safety, permanency, and well-being for children, with a principal place of business located at 1515 Arch Street, Philadelphia, Pennsylvania 19102.

41.     At all material times relevant hereto, Defendant DHS, directly and through its duly authorized employees, agents, workers, and/or representatives, inspected Unit B, for safety, including but limited to, the function and operability of its smoke detectors.

42.     At all material times relevant hereto, Defendant DHS acted by and through its duly authorized employees, agents, workers, and/or representatives acting within the scope of their employment.

43.     Defendant Nadine Fulton (hereinafter "Defendant Fulton") is an adult individual and citizen of the Commonwealth of Pennsylvania with a place of business at the above-captioned address.

44.     Defendant Fulton was, at all times material hereto, a social worker for Defendant DHS. She was responsible for ensuring that families with children under DHS care, supervision, or investigation, are in a safe home. Defendant Fulton is being sued in both her individual and official

capacities.

45.     Defendants DHS and Fulton are hereinafter, collectively, referred to as the "DHS Defendants."

## JURISDICTION AND VENUE

46.     This Complaint alleges that, in connection with their administration of the Public Housing Program pursuant to the United States Housing Act of 1937, 42 U.S.C. 1437 *et seq.*, and an affirmative undertaking and breach of the duty to provide decent, safe, and sanitary living conditions, and make necessary repairs to the subject dwelling. Defendant PHA violated Plaintiffs' Decedents' rights under the Fifth and Fourteenth Amendments of the United States Constitution. This Complaint also alleges that Defendant DHS violated Plaintiffs' Decedents' rights under the Fifth and Fourteenth Amendments of the United States Constitution. Therefore, this Court exercises jurisdiction under 28 U.S.C. § 1331.

47.     The events giving rise to this litigation occurred in Philadelphia County and within the Eastern District of Pennsylvania. Therefore, venue is proper in this Court under 28 U.S.C. § 1391.

## OPERATIVE FACTS
### Public Housing Program Admissions and Continued Occupancy Policy

48.     Public housing was established to provide decent and safe rental housing for eligible low-income families, the elderly, and persons with disabilities. Public housing comes in all sizes and types, from scattered single-family houses to high rise apartments for elderly families.

49.     Under the public housing program, Defendant PHA rents apartments and homes it owns to low and very-low-income families and individuals.

50.     PHA serves many of the lowest-income citizens of Philadelphia: Average

9

household income is $14,213 among public housing households and $11,622 among HCV-assisted households.

51.     The majority of PHA households are headed by seniors (35%) and/or or people with disabilities (48%). PHA developments also house over 15,500 children under the age of 18.

52.     A Housing Authority such as Defendant PHA is responsible for the management and operation of the local public housing program.

53.     The Pennsylvania Housing Authority Law provides that "The public purposes for which such authorities shall operate shall be . . . the providing of safe and sanitary dwelling accommodations for persons of low income through new construction or the reconstruction, restoration, reconditioning, remodeling or repair of existing structures…." *See* 35 P.S. § 1542(d).

54.     Defendant PHA administers its housing program often with the financial assistance of the United States Department of Housing and Urban Development (hereinafter "HUD"). In this capacity, HUD enters an Annual Contributions Contract (hereinafter "ACC") with the participating housing authority—here, Defendant PHA. 24 C.F.R. § 982.151. The ACC requires that the participating housing authority comply with HUD's federal guidelines in operating the housing program and that the contracting housing authority adopt an Admission and Continued Occupancy Policy (hereinafter "ACOP") for the administration of the program. *See* 42 U.S.C. § 1437c-1(d)(3)-(6), (12)-(15); 24 C.F.R. § 903.7(b), (c)-(f), (l)-(n).

55.     As an oversight tool, HUD conducts regular Real Estate Assessment Center (hereinafter "REAC") inspections of certain housing units every one to three years to ensure that public housing units are decent, safe, and sanitary pursuant to HUD set standards.

56.     Pursuant to Defendant PHA's ACOP, "[i]noperable smoke detectors" are

10

considered an "emergency condition" within a dwelling unit.

57.     HUD, PHA, and Pennsylvania state laws regarding habitability all require that emergency conditions such as inoperable smoke detectors be corrected within twenty-four (24) hours.

58.     If Defendant PHA cannot correct the emergency condition within the required twenty-four (24) hours, Defendant PHA must offer the occupants standard alternative accommodations.

59.     In addition to policies and requirements regarding the immediate correction of emergency conditions, PHA and HUD have requirements regarding the number of occupants that may be in any given unit.

60.     Overcrowding can result in dangerous conditions. Therefore, a central purpose of these occupancy policies is to protect the occupants from the dangers associated with overcrowding.

61.     Defendant PHA is required to place families in a unit appropriate for the household's size and needs in accordance with applicable occupancy standards (24 C.F.R. § 966.4(c)(3)). In addition to safety concerns, these occupancy standards ensure that tenants are treated fairly and consistently and receive adequate housing space. One example, as provided by HUD of an occupancy standard, is a limit of two persons per bedroom.

62.     Defendant PHA was required to comply with HUD's occupancy standards with respect to all of its housing and to ensure that a family is not "under-housed" — that is, that too many people will be living in a space than the space can safely accommodate. Section 7.2 of the ACOP states:

"PHA will determine the appropriate unit size for a family based on the Occupancy Standards Table shown below. At admission, these standards will be applied in conjunction with the additional factors outlined in 7.3 Determining Family Unit Size at Admission. During continued occupancy, PHA will determine if the family is over or under-housed based on the Occupancy Standards Table only."

63.    A family is "under-housed" when the total number of occupants on the lease exceed the available number of bedrooms in the unit in accordance PHA's Occupancy Standards Table.

64.    Per these occupancy standards, a four-bedroom unit may have no more than eight (8) occupants.

#### Occupancy Standards Table

| Number of Bedrooms | Min. Persons/Unit | Max. Persons/Unit |
|---|---|---|
| 0 BR | 1 | 1 |
| 1 BR | 1 | 2 |
| 2 BR | 2 | 4 |
| 3 BR | 3 | 6 |
| 4 BR | 4 | 8 |
| 5 BR | 5 | 10 |
| 6 BR | 6 | 12 |

65.    If occupants are under-housed, Defendant PHA's ACOP Section 15.3 regarding Mandatory Transfers requires Defendant PHA to initiate a mandatory transfer of the occupants. Thus, the ACOP provides that a violation of occupancy standards results in "mandatory" transfers to correct the occupancy violations.

66.    As set forth above, (1) if PHA becomes aware of inoperable smoke detectors, PHA is required to fix those smoke detectors within twenty-four (24) hours or move the occupants; and (2) if PHA has an underhoused family as determined by the number of occupants listed on the lease, PHA must correct the under-housing issue by transferring the occupants.

67.    At all times material hereto, Defendants were aware of the health risks and dangers associated with continued overcrowding, lack of operable smoke detectors, and lack of adequate

12

egress in the event of a fire. Defendants were aware that continued overcrowding, lack of operable smoke detectors, and lack of adequate egress in homes can lead to serious bodily injury and/or death.

### 869 N. 23rd STREET

68.   Defendant PHA acquired the property, commonly known as 869 N. 3rd Street, Philadelphia, Pennsylvania 19130 (hereinafter, the "Property") on or around October 8, 1967, for $1.00. At the time, the Property was a single-family dwelling.

69.   While in possession of the Property, Defendant PHA converted the Property from a single-family dwelling to a two-unit apartment comprised of Unit A (first floor), and Unit B (second floor) (collectively, the "Building").

70.   Upon information and belief, the renovations were approved by Defendant Hampson, or the individual who occupied his role, and who will be later identified through discovery.

71.   The Building includes a basement and three floors. Unit A is located on the first and second floors and Unit B is located on the second and third floor. Defendant PHA installed a wall on the second floor separating the portions of the second floor that belong to Unit A from the portions that belong to Unit B.

72.   Unit B has four bedrooms, a kitchen, living room, and is approximately 1,600 square feet in size.

73.   Unit B's living room and kitchen are on the Building's second floor. Unit B's 4 bedrooms are all on the Building's third floor.

74.   During the Property's renovation and conversion, Defendant PHA relocated the

13

stairwells and existing partitions and erected new walls and barriers. These conversions rendered Unit B extremely dangerous because Defendant PHA's configuration allowed for smoke to travel rapidly to the bedrooms in the event of the fire on the second floor.

75.     On or around May 17, 2011, Vanessa McDonald, signed a lease with Defendant PHA to rent Unit B, the four-bedroom apartment for herself, and five (5) of her children and grandchildren: Rosalee McDonald, Virginia Thomas, Quinsha White, Quintien Tate-McDonald, and Destiny McDonald.

76.     Over the years, the McDonald family grew. By 2022, the McDonald family had fourteen (14) members living in the four-bedroom Unit B.

77.     On or around August 1, 2012, Vanessa McDonald signed a new lease agreement, executed by PHA Representative, Defendant Corley, listing six (6) occupants.

78.     On or around March 2015, Defendant Corley completed Family Composition Change Forms, adding three (3) additional occupants: Natasha Wayne, DeKwan Robinson, and Shaniece Wayne.

79.     On or around April 2015, the three (3) additional occupants were added to the April 1, 2012, lease, for a total of nine (9) occupants.

| NAME | RELATIONSHIP | SOCIAL SECURITY NUMBER | BIRTHDATE | M/F | DELE TE/ ADD | DATE |
|---|---|---|---|---|---|---|
| 1. Vanessa Mcdonald | Head of Family | | | F | | 04-01-2012 |
| 2. Rosalee Mcdonald | | | | F | | 04-01-2012 |
| 3. Virginia Thomas | Daugther | | | F | | 04-01-2012 |
| 4. Quinsha White | Daugther | | | F | | 04-01-2012 |
| 5. Quintien Tate - Mcdonald | Daugther | | | M | | 04-01-2012 |
| 6. Destiny Mcdonald | Grandson | | | F | | 04-01-2012 |
| 7. Shaniece Wayne | Grand Daugther Granddaughter | | | F | add | 4/22/15 |
| 8. Natasha Wayne | granddaughter | | | F | add | 4/28/15 |
| 9. Dekwan Robinson | grandson | | | M | add | 4/28/15 |
| 10. | | | | | | |
| 11. | | | | | | |
| 12. | | | | | | |

1

80.     Defendant Corley knew or should have known that the three (3) additional occupants caused Unit B to be overcrowded in violation of Section 7.2 of the ACOP and PHA's Occupancy Guidelines.

81.     Defendant Corley did not initiate a transfer of the occupants into a larger unit that would have allowed for safe accommodations under Section 7.2 of the ACOP and the PHA's Occupancy Guidelines.

82.     On or around August 2016, Vanessa McDonald signed a new lease, executed by PHA Representative, Defendant Moc, listing nine (9) occupants.

83.     Defendant Moc knew or should have known that the nine (9) occupants in a four-bedroom unit was overcrowded in violation of Section 7.2 of the ACOP and PHA's Occupancy Guidelines.

84.     Defendant Moc did not initiate a transfer of the occupants into a larger unit that

---

1 All confidential information has been redacted from this image.

would have allowed for safe accommodations under Section 7.2 of the ACOP and the PHA's Occupancy Guidelines.

85.    Between March 2017 and March 2019, three (3) additional occupants were added to the list of occupants on the lease for a total of twelve occupants.

B.    The Property is for the exclusive use and occupancy by the Tenant, Family Members, and Household Members, listed below:

| NAME | RELATIONSHIP | SOCIAL SECURITY NUMBER | BIRTHDATE | M/F | DELETE/ADD | DATE |
|------|-------------|------------------------|-----------|-----|-----------|------|
| 1. Vanessa Mcdonald | Head of Family | | | F | | 08-01-2016 |
| 2. Natasha Wayne | Granddaughter | | | F | | 08-01-2016 |
| 3. Rosalee Mcdonald | Daughter | | | F | | 08-01-2016 |
| 4. Shaniece Wayne | Granddaughter | | | F | | 08-01-2016 |
| 5. Dekwan Robinson | Grandson | | | M | | 08-01-2016 |
| 6. Virginia Thomas | Daughter | | | F | | 08-01-2016 |
| 7. Quinsha White | Daughter | | | F | | 08-01-2016 |
| 8. Quintien Tate - Mcdonald | Grandson | | | M | | 08-01-2016 |
| 9. *Destiny McDonald* | Granddaughter | | | F | | 08-01-2016 |
| 10. *Jhwan Robinson* | *grandson* | | | m | Add | 3-20-17 |
| 11. *R.W.* | *grandson* | | | m | add | 3-20-17 |
| 12. *Jamiah Roberts* | *granddaughter* | | | F | Add | 3-18-19 INITIAL *MC* |

PH Lease Agreement    Page | 1    PHA1077
Effective Date: 08-01-16

2

86.    On or around February 25, 2019, and May 1, 2019, the tenants completed Applications for Continued Occupancy, handled by PHA Representative Defendant Tabatha Revell.  Defendant Revell incorrectly noted that there were seven occupants residing in Unit B on February 25, 2019, and that there were six occupants on May 1, 2019.  This was incorrect, as the twelfth occupant was added to the lease on March 18, 2019.

---

2 All confidential information has been redacted from this image.

87.    Despite this error, the Plaintiffs were granted continued occupancy in Unit B and Defendant Revell knew or should have known that fourteen total occupants caused Unit B to be overcrowded in violation of Section 7.2 of the ACOP and PHA's Occupancy Guidelines.

88.    Defendant Revell did not initiate a transfer of the occupants into a larger unit that would have allowed for safe accommodations under Section 7.2 of the ACOP and the PHA's Occupancy Guidelines.

89.    In or around May 2021, the tenants completed an Application for Continued Occupancy, handled by Defendants Truc Nguyen and Brahin Bilal, during which two additional occupants were added, for a total of fourteen occupants.



---

3 All confidential information has been redacted from this image.

17

90.     Defendants Nguyen and Bilal knew or should have known that fourteen total occupants caused Unit B to be overcrowded in violation of Section 7.2 of the ACOP and PHA's Occupancy Guidelines.

91.     Defendants Nguyen and Bilial did not initiate a transfer of the occupants into a larger unit that would have allowed for safe accommodations under Section 7.2 of the ACOP and the PHA's Occupancy Guidelines.

92.     Vanessa McDonald and others made repeated requests to Defendant PHA for a transfer to a larger unit due to the severe overcrowding of the family in the apartment and the fact that the family was plainly "underhoused" by PHA's standards.

93.     At all relevant times, Defendant PHA knew of the severe overcrowding in Unit B and the need for additional and/or larger housing.

94.     Over the course of their tenancy in Unit B, Plaintiffs' Decedents were repeatedly subjected to rodent and bug infestations, severe overcrowding, lack of operable smoke detectors, and overall deplorable and unsafe living conditions.

95.     During Plaintiffs' Decedents' tenancy, Unit B consistently received failing scores following its HUD required REAC inspections.

96.     On or around May 20, 2015, Defendant PHA conducted a REAC inspection of Unit B. As a result of the inspection, Unit B received a score of zero for the non-health and safety deficiencies category in the common areas. There were so many deductions that the area would

18

have received a negative number score if such a score was possible. However, HUD does not permit negative number scores so a score of zero was given instead. This is the worst possible safety score that can be given as part of a HUD REAC inspection.

97.     During this May 2015 REAC inspection, the inspector noted missing/inoperable smoke detectors among the Building's many deficiencies.

98.     On July 7, 2017, Unit B *again* received a score of zero for safety because a negative score could not be given. Violations included multiple smoke detector violations, including in the basement; first floor hall; second floor hall; second floor-second bedroom; second floor-third bedroom, and second floor-fourth bedroom. Unit B also received a violation for roach infestation.

## DEPARTMENT OF HUMAN SERVICES FAMILY SUPPORT

99.     Defendant DHS is a government agency that exists, in part, to provide child welfare and juvenile justice services with a goal to provide and promote safety, permanency, and well-being for children.

100.    At all material times relevant hereto, Defendant DHS, directly and through its duly authorized employees, agents, workers, and/or representatives, inspected Unit B for safety, including but limited to, the function and operability of its smoke detectors.

101.    At all material times relevant hereto, Defendant DHS acted by and through its duly authorized employees, agents, workers, and/or representatives acting within the scope of their employment.

102.    In or around December 2021, Defendant DHS received a report regarding child Shaniece Wayne missing a dental appointment. Following the report, Defendant DHS made two (2) safety visits to Unit B, meeting with Shaniece Wayne's mother, Virginia Thomas, and her

children.

103.   Defendant Fulton conducted home safety visits on December 10, 2021, and December 21, 2021.

104.   During her December 10, 2021 safety visit at Unit B, Defendant Fulton noticed that the smoke detectors were inoperable and concluded that they were inoperable due to dead batteries. Her note from that visit states that the smoke detectors were without batteries.  Virginia McDonald stated she would purchase new batteries before Defendant Fulton's next visit.

105.   On December 10, 2021, the smoke detectors in Unit B were inoperable.

106.   On December 21, 2021, Defendant Fulton conducted a second safety visit. During that visit, Social Worker Fulton noted that the smoke detectors were checked again and, although batteries were present, the devices were still inoperable:

> **2. Safety Assessment, Decision and Plan (what actions occurred and why) :**
>
> The children appeared to be safe and well cared for during this visit. The home remained appropriate. SW will complete the PHMC application with Mother during the next visit for bedding. The children continue to sleep on the couches/floor. The smoke detectors were checked again. The batteries were present, but the device were still inoperable. The batteries were removed and inserted again without evidence of them working. It is uncertain if it were the batteries or the device itself that wasn't working. SW reported that she would bring new devices during the next visit.

107.   On December 21, 2021, the smoke detectors in Unit B were inoperable.

108.   On December 21, 2021, Defendant Fulton affirmatively represented to the occupants of Unit B that she would obtain and return with working smoke detectors.

109.   Between December 21, 2021, and the deadly fire on January 5, 2022, Defendant Fulton never brought the promised smoke detectors to Unit B, despite having affirmatively promised she would and despite knowing Unit B was overcrowded, filled with children, and without working smoke detectors.

110.   The occupants of Unit B justifiably relied on Social Worker Fulton's promise to

return with working smoke detectors and, therefore, did not take action of replacing the inoperable

smoke detectors.

### PHA'S VISITS AND REPAIRS IN THE WEEKS LEADING UP TO THE FIRE

111.    In the weeks leading up to the fire, PHA representatives went to the Property on at

least three (3) occasions: December 8, 2021, December 13, 2021, and December 29, 2021. During

each visit, it was reported that quality checks were performed on the smoke detectors and carbon

monoxide detectors and they were operable.

112.    Under PHA policy, whenever a PHA worker visits a property to perform a service

order, the worker is required to complete a service order form. As part of completing a service

order form, the PHA worker is required to confirm that the life-saving smoke detectors and carbon

monoxide detectors are operable.

113.    If a PHA worker determines while performing a service order that a unit's smoke

detectors are inoperable, and the PHA worker correctly completes the service order form by

documenting that the smoke detectors are inoperable, Defendant PHA is then required to fix the

smoke detectors within twenty-four (24) hours.

114.    As noted above, Defendant DHS' records clearly indicated that there were no

operable smoke detectors in Unit B nine (9) days earlier.

115.    However, Defendant PHA's Maintenance records falsely stated the opposite.

116.    On December 30, 2021, Defendants Samuel and Henry were dispatched to Unit B

to restore service to the hot water heater. During the service visit, the Plaintiffs' Decedents told

Defendants Henry and Samuel that the smoke and carbon dioxide detectors were not working.

117.    Defendants Henry and Samuel attempted to repair the smoke and carbon dioxide

detectors, and when they were not able to repair them, they removed them from the ceilings and walls and informed the Plaintiffs' Decedents and Plaintiff Vanessa McDonald that they would return to replace them.

118.   Defendants Samuel and Henry then falsely reported that quality checks were performed on the smoke and carbon monoxide detectors were operable, even though they were not operable.

| Quality checks | Yes | No | NA | |
|---|---|---|---|---|
| Chargeback | ☑ | ☑ | ☐ | |
| Smoke Detectors Inoperable | ☑ | ☑ | ☐ | |
| Carbon Monoxide Detectors Inoperable | ☑ | ☑ | ☐ | |
| Request Housekeeping Inspection | ☑ | ☑ | ☐ | |
| Request Extermination | ☑ | ☑ | ☐ | |

119.   Defendants Samuel and Henry never returned to replace the inoperable smoke detectors that they removed. Neither did any other employee of Defendants PHA returned to replace those inoperable smoke detectors.

120.   As Defendant DHS had confirmed on December 10, 2021, and then again on December 21, 2021, the smoke detectors were still inoperable on January 5, 2022 when the fire occurred in Unit B resulting in the death of Plaintiffs' Decedents.

121.   Had Defendants Samuel and Henry properly reported that the smoke detectors were inoperable, this report would have triggered the twenty-four (24) hour emergency repair per Defendant PHA's policy, which would have required the smoke detectors to be repaired within twenty-four (24) hours of them being reported inoperable.

122.   By falsely documenting that the smoke detectors were operable, an emergency service order was not scheduled within 24-hours as is required by PHA policy.

123.   At the time of the fire, all fourteen residents were inside Unit B, including minor R.W., DeKwan Robinson, Destiny McDonald, Janiyah Roberts, J'Kwan Robinson, Natasha Wayne, Quintien Tate-McDonald, Quinsha White, Rosalee McDonald, Shaniece Wayne, Taniesha Robinson, Tiffany Robinson, Howard Robinson, and Virginia Thomas.

124.   Had the smoke detectors been operable, Plaintiffs' Decedents would have had an early warning of the fire and been able to escape before the fire rendered Unit B inescapable.

125.   Fire and smoke spread throughout Unit B during the January 5, 2022, fire. The fire and smoke killed DeKwan Robinson, Destiny McDonald, Janiyah Roberts, J'Kwan Robinson, Natasha Wayne, Quintien Tate-McDonald, Quinsha White, Rosalee McDonald, Shaniece Wayne, Taniesha Robinson, Tiffany Robinson, and Virginia Thomas.

## ATF REPORT

126.   Firefighter Mcguigan stated he heard no alarms sounding from within the incident structure but added he heard an alarm sounding from a neighboring building.

127.   Per the ATF Report, the only smoke detector that was operable inside the building was found in the stairwell to the basement – a location outside of Unit B.

128.   Thus, this smoke detector was not recovered in Unit B.

129.   Accordingly, every detector located or recovered within Unit B was inoperable and non-functional.

130.   The above conduct by all Defendants, and their agents, representatives, and employees, was so egregious and outrageous that it shocks the conscience.

## 2015-2019 STRATEGIC PLANNING

131.   In 2014, Defendant PHA – through Defendants Jeremiah and Jordon – embarked

on a Strategic Directions Plan for 2015 through 2019.[4]

132.    Strategic Priority #2 aimed at achieving "Excellence. In the Provision of Management and Maintenance Services to PHA Residents."[5]

133.    Measures of success would be based – in part – on meeting or exceeding service order completion benchmarks for 98% or greater for all service orders and ensuring that all housing units and developments met or exceeded Uniform Physical Conditions Standards.[6]

134.    As part of this Plan, PHA sought to "re-focus and strengthen ongoing sit-level comprehensive preventive maintenance activities, achieve continuous improvement in physical conditions as measured by inspection results, and work to improve efficiency and customer service…."[7]

135.    Further, PHA sought to implement "initiatives to ensure that all residents are housed in appropriately sized units…."[8]

136.    Strategic Priority #10 aimed to "Make PHA an Employer of Choice with an Accountable, Diverse, Trained, and Productive Workforce."[9]

137.    PHA sought to achieve this through the implementation of "annual performance evaluations and follow up actions as needed for all employees."

138.    Ensuring that every employee has the necessary training, tools, and other resources to do their jobs properly is the focus of this strategic priority.[10]

139.    On an annual basis, PHA will establish and implement a training plan to build

---

[4] https://www.pha.phila.gov/wp-content/uploads/2021/12/2014_strategic_plan-web1.pdf
[5] https://www.pha.phila.gov/wp-content/uploads/2021/12/2014_strategic_plan-web1.pdf
[6] *Ibid.*
[7] *Ibid.*
[8] *Ibid.*
[9] *Ibid.*
[10] *Ibid.*

employee skills and capacity and will conduct thorough performance evaluations designed to provide employees with meaningful feedback on their job performance.[11]

### 2016 PHA Office of Audit and Compliance Report

140.    In its Annual 2016 Office of Audit and Compliance Report, Defendant PHA noted that an employee was conducting personal business during work hours. In essence, while he/she was supposed to be working in his/her capacity as a PHA employee, the employee was conducting unrelated business.[12]

141.    An internal investigation revealed that the employee was altered various documents to appear that the employee completed his/her PHA assigned work timely.[13]

142.    PHA also revealed that another employee was falsifying tenant records and documents.  The employee had been alleging that she was completing tenant recertifications; however, the documents were falsely altered and backdated.[14]

### 2020 PHA Office of Audit and Compliance Report

143.    In its Annual 2020 Office of Audit and Compliance Report, Defendant PHA noted that a longtime maintenance employee, while reporting and receiving payment for completing PHA work during his/her designated PHA schedule, was instead working during that time at his/her private contracting building.[15]

144.    It was further noted that the PHA employee falsely documented on his/her PHA timecard that he/her worked during his designated eight-hour work shift.[16]

---

[11] https://www.pha.phila.gov/wp-content/uploads/2021/12/2014_strategic_plan-web1.pdf
[12] https://www.pha.phila.gov/wp-content/uploads/2021/12/2016_oac_annual_report-14.pdf
[13] *Id.*
[14] *Id.*
[15] https://www.pha.phila.gov/wp-content/uploads/2021/12/oac_accomplishments_report_2020.pdf
[16] *Id.*

145.   PHA Defendants failed to correct the custom of employees fabricating records to falsely reflect that work was performed, when it had not been performed as reported.

### *ABC's 2020 Report*

146.   PHA Defendants were also on notice of their employees' custom of failing to properly inspect and repair inoperable smoke detectors.

147.   In 2020, ABC local produced a segment titled "*Without Warning. Thousands of public housing facilities have failed inspection after inspection when it comes to smoke alarms. Is enough being done to make sure residents are safe.*" [17]

148.   The segment was subtitled "*Tens of thousands living in Philadelphia-area complexes where inspectors found smoke detector problems from 2014 to 2019.*"

149.   According to the report, "[HUD] inspectors have found failed smoke detectors or other life-threatening conditions over the last five years. Even more troubling: in 90% of those buildings, the legally-mandated follow-up inspections by the federal government were months, even years, behind schedule." [18]

150.   The report further noted, "HUD flagged 71 out of 78 complexes run by the Philadelphia Housing Authority for failed smoke detectors or other potentially life-threatening conditions like gas leaks, exposed electrical wires, or blocked fire escapes." [19]

151.   Despite PHA Defendants' knowledge of the above customs, Defendants failed to correct the improper customs, promulgate policies to ensure PHA residents were safe in homes with operable smoke detectors, or adequately supervise and train PHA employees regarding.

---

[17] https://dig.abclocal.go.com/wpvi/without-warning-philadelphia/index.html
[18] *Id.*
[19] *Id.*

152.    PHA Defendants were additional on notice due to other fires that occurred at Defendant PHA's properties due to Defendant PHA's failure to provide operable smoke detectors. In particular, they were on notice of fires that had occurred at Plymouth Hall, 5132 Irving Street, 1421 North 8th Street, and 1904 Carpenter Street.

*Plymouth Hall*

153.    On October 7, 2004, a three-alarm fire occurred at Plymouth Hall, a four story, 70-unit apartment building for senior citizens with low to moderate income located in Philadelphia, Pennsylvania. Plymouth Hall was owned and operated by PHA.

154.    Prior to the fire, Zone # 1 of the fire alarm system was disconnected or bypassed by a PHA employee leaving 53 heat detectors, or 50% of the first-floor heat detection system nonfunctional.

155.    As a result, the heat detector circuit in Herman Nance's apartment failed, activation of the main fire alarm system was delayed, and the tenants were not timely warned.

156.    The fire, smoke, and soot contributed to injuries of many of the tenants and the deaths of three tenants: Herman Nance, Henrietta Alston, and Geraldine Thornton.

*5132 Irving Street*

157.    On January 19, 1979, a fire broke out at the residence of Jean Myers located at 5132 Irving Street in Philadelphia, Pennsylvania. PHA owned the property and failed to install smoke detectors. Jean Myers, suffering burns, escaped. Her five children died. Tanya Jones also died in the fire.

*1421 North 8th Street*

158.    On March 21, 1988, a fire occurred which completely damaged 1421 North 8th Street

27

in Philadelphia, Pennsylvania due to PHA's failure to provide operable smoke detectors. Thelma Reed's personal property located was also damaged and destroyed in the fire.

*1904 Carpenter Street*

159.   On April 30, 2007, at 1904 Carpenter Street in Philadelphia, Pennsylvania, a fire occurred. A five-year-old girl died as a result of the fire. The property was owned by PHA.

160.   No working smoke alarms were found inside the home.

**COUNT I**
**CIVIL RIGHTS: *MONELL* CLAIM**
***Plaintiffs v. Defendant PHA***

161.   The previous paragraphs are incorporated herein by reference.

162.   PHA Defendants' conduct as set forth above, acting under color of state law, was recklessly, willfully, and deliberately indifferent to the health, safety, and well-being of Plaintiffs' Decedents, Dekwan Robinson, Destiny McDonald, Janiyah Roberts, J'Kwan Robinson, Natasha Wayne, Quintien Tate-McDonald, Quinsha White, Rosalee McDonald, Shaniece Wayne, Taniesha Robinson, Tiffany Robinson, and Virginia Thomas, and was committed in conscious and deliberate disregard of the substantial and/or unjustifiable risk of causing harm to members of the public and to Plaintiffs' Decedents and was so egregious as to shock the conscience.

163.   PHA Defendants' conduct as set forth above, pursuant to the policies and customs of Defendant PHA, violated Plaintiffs' Decedents' rights pursuant to the Fifth and Fourteenth Amendments to the United States Constitution, the United States Housing Act of 1937, 42 U.S.C. § 1437, and the implementing regulations promulgated in connection therewith, principally found within the Public Housing Program Admissions and Continued Occupancy Policy by *inter alia*:

   a) failing to train employees, representatives, and/or agents to not falsify inspection reports regarding the operability of the smoke detectors;

b)  failing to train employees, representatives, and/or agents to not falsify inspection reports to avoid and/or prevent emergency services to replace the smoke detectors;

c)  failing to train employees, representatives, and/or agents on how to properly conduct a safety check and assess the operability of smoke detectors.

d)  failing to train employees, representatives, and/or agents on how to properly document if smoke detectors are inoperable to ensure a 23-hour emergency repair of the smoke detectors;

e)  failing to promulgate policies and/or procedures relating to the inspection and assessment of units;

f)  failing to train employees, representatives, and/or agents on the inspection and assessment of units;

g)  failing to supervise employees, representatives, and/or agents on the inspection and assessment of units;

h)  failing to classify ACOP violations as 24-hour violations in the setting of life-threatening health risks from continuing overcrowding, fire hazards, and the lack of operable smoke detectors;

i)  failing to train employees, representatives, and/or agents on the conditions under which ACOP violations should be classified as 24-hour emergency violations, especially in the setting of life-threatening health risks from continuing overcrowding, fire hazards, and lack of operable smoke detectors;

j)  failing to supervise employees, representatives, and/or agents on the conditions under which ACOP violations should be classified as 24-hour emergency violations, especially in the setting of life-threatening health risks from continuing overcrowding, fire hazards and lack of operable smoke detectors;

k)  failing to train employees, representatives, and/or agents to recognize that, in the setting of continuous overcrowding, fire hazards, and lack of operable smoke detectors, occupants should have been transferred to larger or different housing units;

l)  failing to remediate excessive overcrowding, fire hazards, lack of egress, and lack of operable smoke detectors;

29

m) failing to promulgate a policy and/or procedure for remediating excessive overcrowding, fire hazards, lack of egress, and lack of operable smoke detectors;

n) failing to train employees, representatives, and/or agents on the remediation of excessive overcrowding, fire hazards, lack of egress, and lack of operable smoke detectors;

o) failing to supervise employees, representatives, and/or agents on the remediation of excessive overcrowding, fire hazards, lack of egress, and lack of operable smoke detectors;

p) failing to promulgate a policy, custom, or procedure that accommodates tenants who are illiterate and unable to read and/or write;

q) failing to grant Plaintiffs' Decedents a voucher to transfer to safe and decent housing after each and every PHA inspection;

r) failing to promulgate policies and/or procedures for the issuance of transfer vouchers to families living in life-threatening, unsanitary conditions, such as in the setting of excessive overcrowding, insect and vermin infestations, lack of smoke detectors, and lack of egress;

s) failing to train employees, representatives, and/or agents on the issuance of transfer vouchers to families living in life-threatening, unsanitary conditions, such as in the setting of excessive overcrowding, insect and vermin infestations, lack of operable smoke detectors, and lack of egress;

t) allowing a custom in which employees, representatives, and/or agents disregarded Section 7.2 of the ACOP and Defendant DHS Occupancy Guidelines, and allowed tenants to live in overcrowded units, with deliberate indifference for the safety of the tenants;

u) failing to supervise employees, representatives, and/or agents on the issuance of transfer vouchers to families living in life-threatening, unsanitary conditions, such as in the setting of excessive overcrowding, insect and vermin infestations, lack of operable smoke detectors, and lack of egress;

v) failing to train employees, representatives, and/or agents on how to conduct adequate inspections;

w) failing to train employees, representatives, and/or agents to not give units passing grades without inspecting the units;

x) allowing a custom in which employees, representatives, and/or agents gave units passing grades without inspecting the units;

y) allowing a custom in which employees, representatives, and/or agents, failed to conduct quality checks of smoke detectors when conducting maintenance repairs, and customarily indicated that the smoke detectors were operable, when the employee, representative, and/or agent did not do a quality check of the smoke detectors;

z) failing to train employees, representatives, and/or agents to not give units failing grades without correcting the unit's deficiencies;

aa) failing to promulgate policies and/or procedures on the need to conduct adequate inspections, especially in units with a history of violations;

bb) failing to train employees, representatives, and/agents on the need to conduct adequate annual inspections, especially in units with a history of violations;

cc) failing to supervise employees, representatives, and/agents on the need to conduct adequate inspections, especially in units with a history of violations;

dd) failing to hire competent inspectors, appraisers, customer service representatives, Eligibility and Compliance Supervisors, management, and staff;

ee) failing to promulgate proper policies and procedures on adequately maintaining client files;

ff) failing to train employees, representatives, and/or agents on adequately maintaining client files;

gg) failing to supervise employees, representatives, and/or agents on adequately maintaining client files;

hh) failing to adequately analyze staffing needs;

ii) failing to identify training needs and establish policies and procedures to train employees, representatives, and/or agents;

jj) failing to follow the policies and procedures of PHA's Administrative Plan and internal policies;

31

kk) failing to adequately supervise employees, representatives, and/or agents;

ll) allowing a custom in which employees, representatives, and/or agents remodeled and reconstructed properties without ensuring the renovations were fire safe with adequate means for emergency egress; and

mm) failing to take prompt and vigorous action to ensure Plaintiffs' Decedents lived in a home:

      i.    free of excessive overcrowding;

      ii.    free of insect and vermin infestations;

      iii.    with operable smoke detectors;

      iv.    with adequate egress for emergency exiting; and

      v.    with an adequate structure and building that would have prevented the rapid spread of smoke and fire from the point of origin to the occupants bedrooms/sleep quarters; with a structure that is sound and does not present any threat to the health and safety of the occupants, and does not promote the spread of smoke and/or fire to bedrooms.

164.    PHA Defendants created and promoted a culture, custom, pattern, and/or practice within its company to disregard and deliberately fail to enforce its own policies and/or implement policies that promoted life and safety amongst tenants, such as Plaintiffs' Decedents.

165.    As mentioned throughout this Complaint, PHA Defendants knew of the grave risks associated with overcrowding, fire hazards, and the lack of operable smoke detectors, and the serious dangers that the conditions posed to the Plaintiffs' Decedents within Unit B.

166.    As mentioned throughout this Complaint, PHA Defendants knew that should a fire ignite in Unit B and the 14 occupants not be alerted of the fire by way of operable smoke detection systems, there would be an increased risk and high likelihood of death and/or bodily injury.

167.    Despite being armed with this knowledge, PHA Defendants disregarded the grave risks and did not take reasonable measures to the address them, but instead, PHA continuously allowed unsafe conditions, such as fire hazards, overcrowding, and lack of operable smoke detectors to exist within Unit B by failing to enforce its own policies and/or implement maintenance polices that addressed life threatening safety hazards.

168.    PHA Defendants' actions constituted a deliberate indifference to the rights and safety of Plaintiffs' Decedents, as it did not adequately train and/or supervise its own Commissioners, Executive Director or other employees/representatives so as to ensure that polices regarding the maintenance against life-threatening conditions were enforced, implemented, and/or complied with it during unit inspections.

169.    PHA was aware that inadequate training and/or supervision of its own Commissioners, Executive Director or other employees/representatives regarding the maintenance against life-threatening conditions, such as fire hazards, overcrowding, and lack of operable smoke detectors would increase the risk and likelihood that tenants would suffer serious bodily injury or death in the event of a fire.

170.    Further, PHA Defendants, through the conduct described above, violated Defendant PHA's internal policies and thus violated Section 1437f(o)(8) of the United States Housing Act of 1937, its supporting regulations found in 24 C.F.R. § 982, and the Handbook issued by HUD, all remediable through 42 U.S.C. § 1983.

171.    As a direct and proximate result of the violations of their civil rights, Plaintiffs' Decedents, were caused to suffer catastrophic, debilitating injuries, and death as set forth above.

**WHEREFORE,** Plaintiff demands judgment against all Defendants, individually and/or

33

jointly and severally, in excess of $150,000.00, exclusive of interest and costs, which sum includes all damages recoverable under 42 U.S.C. § 1983.

**COUNT II**
**CIVIL RIGHTS: STATE CREATED DANGER**
***Plaintiffs v. Defendants PHA, Jeremiah, Jordon, Indala, Moc, Corley, Revell, Nguyen, Bilal,***
***and Hampson***

172.    The previous paragraphs are incorporated herein by reference.

173.    The PHA Defendants' conduct as set forth above, acting under color of state law, was recklessly, willfully, and deliberately indifferent to the health, safety, and well-being of Plaintiffs' Decedents, and was committed in conscious and deliberate disregard of the substantial and/or unjustifiable risk of causing harm to members of the public and to Plaintiffs' Decedents and was so egregious as to shock the conscience.

174.    The act of removing the smoke detectors, then intentionally misrepresenting – by Defendants Samuel and Henry in their reports – that the smoke detectors were operable all while knowing that said detectors were not, are actions that shock the conscious.

175.    The harm caused to Plaintiffs' Decedents was foreseeable to PHA Defendants and a direct result of their aforementioned conduct.

176.    Specifically, it was foreseeable that Defendants Samuel and Henry, knowingly, intentionally, deliberately, and willfully averring in their property checks that the smoke detectors in Unit B were operable, while being fully aware that the smoke detectors were either not inoperable was a clear and foreseeable harmful action that could and would result in life-saving devices not being present/operable to preserve the lives of Plaintiffs' Decedents, DeKwan Robinson, Destiny McDonald, Janiyah Roberts, J'Kwan Robinson, Natasha Wayne, Quintien Tate-McDonald, Quinsha White, Rosalee McDonald, Shaniece Wayne, Taniesha Robinson,

Tiffany Robinson, and Virginia Thomas.

177.    A relationship existed between the PHA Defendants and Plaintiffs' Decedents such that they were foreseeable victims of the PHA Defendants' conduct, as opposed to being members of the public in general.

178.    Defendants PHA, Samuel, and Henry, acting under color of state law, affirmatively exercised their authority in a manner that created a danger to Plaintiffs' Decedents and/or used their authority in a way that rendered Plaintiffs' Decedents more vulnerable to danger than had the Defendants not acted at all. Such conduct include falsely noting on their service order report that the smoke detectors were checked, and were operable, when they were not operable.

179.    By removing the smoke and carbon dioxide detectors, then falsifying and deliberately affirming that the smoke detectors were properly operating, Defendants Samuel and Henry, placed Plaintiffs' Decedents in a position where they were subjected to danger in the event of a fire taking place.

180.    Defendants PHA, Indala, and Hampson, or the individual to be identified through discovery, acting under color of state law, affirmatively exercised their authority in a manner that created a danger to Plaintiffs' Decedents and/or used their authority in a way that rendered Plaintiffs' Decedents more vulnerable to danger than had Defendants not acted at all. Such conduct included:

   a)  removing the means of emergency egress from the Property; and

   b)  remodeling and constructing the Property in way that made it more prone to spread fire and smoke throughout its sleeping quarters.

181.    By remodeling and constructing the Property and removing the means of egress, Defendant PHA, through its workers Defendants Indala and Hampson, or the individual to be

35

identified through discovery, placed Plaintiffs' Decedents in a position where they were subjected to danger in the event of a fire taking place.

182.    Defendants, PHA, Moc, Corley, Revell, Nguyen, and Bilal, acting under color of state law, affirmatively exercised their authority in a manner that created a danger to Plaintiffs' Decedents and/or used their authority in a way that rendered Plaintiffs' Decedents more vulnerable to danger than had the Defendants not acted at all. Such conduct included:

    a)  requiring Plaintiffs' Decedents to continue living in Unit B and to wait for Defendant PHA to approve and provide a transfer voucher, despite the existence of serious, continuing, and life-threatening violations;

    b)  requiring that Plaintiffs' Decedents to remain in Unit B, despite the fact that it was found to have multiple fire hazards, no operable smoke detectors, and other life-threatening violations;

    c)  leasing Unit B to multiple residents exceeding the maximum occupancy guidelines pursuant to the Philadelphia Housing Authority Admission and Continuing Occupancy Policy Occupancy Standards; and

    d)  continuing to allow continued occupancy and to renew the leases to multiple residents, totaling fourteen (14) residents, for a four-bedroom apartment, exceeding the maximum occupancy guidelines pursuant to the Philadelphia Housing Authority Policy Handbook, Occupancy Standards.

183.    By renting Unit B, a four-bedroom apartment to fourteen individuals in violation of Section 7.2 of the ACOP, and Defendant PHA's Occupancy Guidelines, Defendant PHA, through its representatives Defendants Jeremiah, Jordon, Indala, Moc, Corley, Revell, Nguyen, and Bilal, placed Plaintiffs' Decedents in a position where they were subjected to danger in the event of a fire taking place.

184.    Here, the PHA Defendants utilized their state power of being authorized and instill with the task of performing these necessary and vital quality checks on life-saving devices within

Unit B.

185.     The aforementioned affirmative conduct violated Plaintiffs' Decedents' rights under the Fifth and Fourteenth Amendments to the United States Constitution, remediable through 42 U.S.C. § 1983.

186.     As a direct and proximate result of the violations of their civil rights through the aforementioned affirmative acts, Plaintiffs' Decedents were caused to suffer catastrophic, debilitating injuries, and death as set forth above.

**WHEREFORE,** Plaintiffs demand judgment against all defendants, individually and/or jointly and severally, in excess of $150,000.00, exclusive of interest and costs, which sum includes all damages recoverable under 42 U.S.C. § 1983.

**COUNT III**
**CIVIL RIGHTS:** *MONELL* **CLAIM**
***Plaintiffs v. DHS***

187.     The previous paragraphs are incorporated herein by reference.

188.     Defendant DHS's conduct as set forth above, acting under color of state law, was recklessly, willfully, and deliberately indifferent to the health, safety, and well-being of Plaintiffs' Decedents, DeKwan Robinson, Destiny McDonald, Janiyah Roberts, J'Kwan Robinson, Natasha Wayne, Quintien Tate-McDonald, Quinsha White, Rosalee McDonald, Shaniece Wayne, Taniesha Robinson, Tiffany Robinson, and Virginia Thomas, and was committed in conscious and deliberate disregard of the substantial and/or unjustifiable risk of causing harm to members of the public and to Plaintiffs' Decedents and was so egregious as to shock the conscience.

189.     Pursuant to Defendant DHS's Safety Manual, there are a list of potential present danger threats, that require immediate protective action is to be taken. Such circumstances include

37

life threatening living arrangements, such as fire hazards. However, Defendant DHS's Safety Manual does not provide clear guidance as to how to check for inoperable smoke detectors, and how to assist the family in obtaining operable smoke detectors.

190.    Defendant Fulton's conduct as set forth above, pursuant to the policies and customs of Defendant DHS, violated Plaintiffs' Decedents' rights pursuant to the Fifth and Fourteenth Amendments to the United States Constitution, by *inter alia*:

    a) failing to promulgate a policy, custom, or procedure that describes how employees, representatives, and/or agents are to perform home safety checks to ensure that children are safe, and the homes within which they live contain working and operable smoke detectors;

    b) failing to define "fire hazard" in its Safety Manual or provide guidance to its employees, representatives, and/or agents as to significance of not having operable smoke detectors as it relates to a "fire hazard."

    c) failing to train employees, representatives, and/or agents on how to perform home safety checks to ensure that children are safe, and that their homes contain working and operable smoke detectors;

    d) failing to promulgate a policy, custom, or procedure that describes how employees, representatives, and/or agents are to communicate and work with other local government agencies, such as PHA, to ensure the children and families are not living in overcrowded homes;

    e) failing to train employees, representatives, and/or agents on how to communicate and work with other local government agencies, such as PHA, to ensure the children and families are not living in overcrowded homes.

    f) failing to train employees, representatives, and/or agents on how to properly document if smoke detectors are inoperable to ensure a 23-hour emergency repair of the smoke detectors; and

    g) allowing a custom in which employees, representatives, and/or agents disregarded safety concerns such as a home having inoperable smoke detectors.

191.    As a direct and proximate result of the violations of their civil rights, Plaintiffs'

Decedents, were caused to suffer catastrophic, debilitating injuries, and death as set forth above.

**WHEREFORE,** Plaintiff demands judgment against all Defendants, individually and/or jointly and severally, in excess of $150,000.00, exclusive of interest and costs, which sum includes all damages recoverable under 42 U.S.C. § 1983.

**COUNT IV**
**CIVIL RIGHTS: STATE CREATED DANGER**
***Plaintiffs v. Defendants DHS and Nadine Fulton***

192.     The previous paragraphs are incorporated herein by reference.

193.     The DHS Defendants' conduct as set forth above, acting under color of state law, was recklessly, willfully, and deliberately indifferent to the health, safety, and well-being of Plaintiffs' Decedents, DeKwan Robinson, Destiny McDonald, Janiyah Roberts, J'Kwan Robinson, Natasha Wayne, Quintien Tate-McDonald, Quinsha White, Rosalee McDonald, Shaniece Wayne, Taniesha Robinson, Tiffany Robinson, and Virginia Thomas, and was committed in conscious and deliberate disregard of the substantial and/or unjustifiable risk of causing harm to members of the public and to Plaintiffs' Decedents and was so egregious as to shock the conscience.

194.     The harm caused to Plaintiffs' Decedents was foreseeable to the DHS Defendants and a direct result of its aforementioned conduct.

195.     A relationship existed between the DHS Defendants and Plaintiffs' Decedents such that they were foreseeable victims of the DHS Defendants' conduct, as opposed to being members of the public in general.

196.     DHS Defendants, acting under color of state law, through the conduct alleged above, affirmatively exercised their authority in a manner that created a danger to Plaintiffs' Decedents and/or used its authority in a way that rendered Plaintiffs' Decedents more vulnerable

to danger than had Defendant Fulton not acted at all. Such conduct included:

    a) confirming that the smoke detectors were inoperable;

    b) promising to return with operable smoke detectors to replace the inoperable smoke detectors; and

    c) requiring and allowing Plaintiffs' Decedents to reasonably rely upon the representation that Social Worker Fulton would return with operable smoke detectors.

197. The aforementioned affirmative conduct violated Plaintiffs' Decedents' rights under the Fifth and Fourteenth Amendments to the United States Constitution, remediable through 42 U.S.C. § 1983.

198. As a direct and proximate result of the violations of their civil rights through the aforementioned affirmative acts, Plaintiffs' Decedents were caused to suffer catastrophic, debilitating injuries, and death as set forth above.

**WHEREFORE,** Plaintiffs demand judgment against all Defendants, individually and/or jointly and severally, in excess of $150,000.00, exclusive of interest and costs, which sum includes all damages recoverable under 42 U.S.C. § 1983.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiffs ask the Court to:

    a. Order that Defendants be enjoined from further violations of PHA tenants' rights;

    b. Enter judgment in Plaintiffs' favor, against all Defendants;

    c. Order Defendants be required to follow all federal, state and municipal laws, rules and regulations, both retroactively and prospectively, including the requirement to inspect every single public housing dwelling and test to determine whether the apartments, units, and buildings (and common areas of multiple dwellings) contain

40

operable smoke detectors and carbon monoxide detectors and – if not – ensure that replacement is made of the inoperable smoke detectors and/or carbon monoxide detectors;

d. Order Defendants be required to follow all federal, state and municipal laws, rules and regulations, both retroactively and prospectively, including the requirement to inspect every single public housing dwelling and determine whether the apartments and units are not over-housed and are occupied in accordance with the Occupancy Standard for PHA;

e. Order Defendant PHA retrain all of its employees as to proper standards and requirements for the inspections of smoke detectors and carbon monoxide detectors inside PHA properties;

f. Order Defendant PHA retrain all of its employees as to proper standards and requirements for ensuring its properties are not over-housed and are occupied in accordance with the Occupancy Standard for PHA;

g. Appoint an independent monitor to oversee PHA's compliance with its smoke detectors and carbon monoxide detectors inspection obligations;

h. Award Plaintiffs compensatory damages (well in excess of $150,000.00) against all Defendants (this includes but is not limited to all damages permitted under Pennsylvania's Survival and Wrongful Death Acts, including Plaintiffs' Decedents' immense pain and suffering and the loss suffered by Plaintiffs' Decedents' loved ones);

i. Award exemplary and punitive damages against all Defendants;

41

j.   Award such interest as the law permits;

k.   Award Plaintiffs attorney fees and costs pursuant to 42 U.S.C. § 1988; and

l.   Provide Plaintiffs with such other and further relief as the Court deems just and equitable.

Respectfully Submitted,

**KLINE & SPECTER, PC**

By: _____

THOMAS R. KLINE, ESQUIRE
AARON L. DUNBAR, ESQUIRE
SHERRELL DANDY, ESQUIRE
FRANK MANGIARACINA, ESQUIRE
***Attorneys for Plaintiffs***

Date:  January 4, 2024